BILBY v. BEAN *et al.*

No. 3317. Opinion Filed December 20, 1913.

Rehearing Denied April 17, 1914.

(137 Pac. 691.)

1. **FORCIBLE ENTRY AND DETAINER**—Grounds—Forcible Dispossession. In an action of forcible entry and detainer, where the undisputed evidence shows that the plaintiff had been in possession of the premises for some five or six years, and the defendants, during his temporary absence, and without his consent, entered upon the premises and held possession by force of arms, a verdict for the defendants should be set aside and the cause remanded, with direction to the trial court to enter judgment for the plaintiff.

2.     **SAME—Scope of Proceeding—Title.** In an action of forcible entry and detainer, the right of possession only, and not the title, can be tried.

(Syllabus by Galbraith, C.)

*Error from County Court, Hughes County;*
*John L. Coffman, Special Judge.*

Action by Nicholas Bilby against William Bean and another. Judgment for defendants, and plaintiff brings error. Reversed and remanded, with directions.

*L. C. Lawson,* for plaintiff in error.

*Warren & Miller,* for defendants in error.

Opinion by GALBRAITH, C. This was an action in forcible entry and detainer tried in the county court of Hughes county, before John L. Coffman, a member of the bar of that county, elected as special judge after the regular judge had been disqualified by the defendants. The action involved the right of possession of 40 acres of land, being a part of the allotment of Little Peter, a Creek citizen of full blood; the allotment being made to the heirs of Little Peter after his death, he having died either in 1900 or 1901.

Plaintiff's claim of title to the land was based upon a warranty deed from the heirs of Little Peter, executed on August 5, 1904. The defendants were tenants of John W. Gilliland, who claimed title under a quitclaim deed from John O. Chapman, dated January 17, 1910. Chapman held a deed from the heirs of Little Peter under date of October 31, 1908, which deed had been approved by the judge of the county court of Hughes county on the 31st day of October, 1908. The evidence is undisputed that Bilby was in possession of the land in February, 1911, and that he had possession of the land for some five or six years prior to that date; that Bilby had grown a crop of corn on the land for the year 1910, all of which was not gathered until the latter part of January or the early part of February, 1911, and immediately after the corn was gathered Bilby turned cattle and hogs upon the land; that on the 8th day of Febru-

ary, 1911, the defendants, without the consent of the plaintiff, entered upon the land and commenced plowing; that when the plaintiff's tenants found the plows on the land they removed them out on the highway and nailed up and locked the gates in the fence inclosing the land. To show the manner in which the defendants obtained and held possession of the premises in controversy, a few excerpts from the testimony of the witnesses will be given.

Ed Turner, a witness for the plaintiff, testified in part as follows:

"Q. Would you please state to the jury if you know how they got in possession of these lands? A. Well, Mr. Bilby was plowing there on the 9th and Mr. Bean and Mr. Brown come over and I was sent down there to tell them to stay off, and they came over in the morning and asked Mr. Bryant and Mr. Ayers who they rented from, and they told them they rented from Mr. Bilby, and then I come up, and they asked me what Mr. Bilby had said about it and what I was doing there, and I told them that he had sent me down there to tell them to stay off. Q. Just state what they did there to get in? A. They said they would go to town that afternoon and see what could be done about it. The next morning about 5 o'clock I got up and went down to the field and about 6 they come over to the field and come in. Q. Who? A. Bill Bean and Bill Brown and Ira Bean. Q. The defendants in this case? A. Yes, sir. I rode down there and got there just before they came up to where I was and says: 'Ed, we have cut the fence. You had better guard the cattle to keep them from getting out through the gate to the road.' Then he went on back to where their plows were and went to plowing, and they took and set Mr. Bilby's plows outside the fence. Q. What time was that? A. About 6 o'clock. Q. You say they had been there the day before? A. Yes, sir. Q. Who was in possession the day before? A. Mr. Bilby had two men working there. Q. Who was working there the day before? A. Bryant and Ayers. Q. What Bryant and Ayers? A. Coleman Bryant and George Ayers. Q. Were there any cattle in there on the 10th day of February, 1911? A. Yes, sir. Q. Whose? A. Mr. Bilby's. Q. About how many. A. About 50 or 55 head. Q. What was done with the cattle? A. They drove them back into the other field. Q. What time on the morning of the 10th did you get down to these premises? A. 5 o'clock. Q. Did you see anybody there at the time you got there? A. No,

sir. Q. About how long from that time was it until Bean and Brown appeared? A. About 6 I think. Q. What was their attitude towards you? What did they do and say? A. I had gone down and built up a fire as it was pretty cold and I heard some one moving around back of the field. I didn't know who it was, so I rode over back of the field, and as I rode back I heard something sounded like knocking down the gate. I rode on down to the gate and Bill Brown hollered and said, 'We've tore down the gate and we're going down there and nail the other one up.' Q. What gate? A. The gate on the west side of the field. Q. Was it a small gate or a large one? A. It was a gate for wagon and team. Q. Back of the premises? A. Yes, sir. Q. Was that the gate that was wired up the day before? A. I don't know just when it had been wired up. Q. When you saw it the day before was it wired up though? A. Yes, sir. Q. That morning did you see any guns? A. Yes, sir; they had two. Q. Who had two? A. Bill Bean and Bill Brown. Q. What kind? A. Double-barreled shotguns. Q. What did they do with the shotguns? A. They didn't do anything with them, just carried them along in their hands and on their shoulders. Q. What did they do with the plows that Mr. Bilby had there the day before, plowing? A. Took them and set them outside in the road. Q. Was it daylight at that time? A. Not hardly. Q. What did you go up there for, Mr. Turner? A. I was sent over there to guard the field. Q. Did you guard it? A. No, I didn't get them out. Q. Why? A. I didn't want to have any racket or fight. Q. Did you tell them to stay out? A. Yes, sir. Q. Was that the gate that Mr. Bilby's men had been going in and out of the field? A. Yes, sir. Q. What did they say they were going to nail it up for? A. They didn't say. Q. Did they nail it up? A. Yes, sir. Q. How did you know that they had torn down the gate? A. They told me. Q. Which one? A. Bill Brown. Q. How far were they from you at the time they came down to the gate that you spoke of and told you that? A. About 50 or 75 feet. Q. They got in before you got up there? A. Yes, sir. Q. What was done with their guns? A. One was carrying his gun in his hand and one carried his on his shoulder. * * * Q. What was the condition of the fence before that? A. It was up in good shape. Q. How do you know? A. I had been along it the day before on the 9th of February, 1911. Q. What condition did you leave the gate in on that night when you left there? A. Wired up and steepled. Q. Who did that? A. I think Mr. Gamble did. Q. Who had been in possession of

those lands before that time? A. Mr. Bilby raised a corn crop on it. Q. What year? A. 1910."

George Ayers, a witness for the plaintiff, testified:

"Q. Now just state to the court and jury what took place there on the 10th of February. A. We went down there on the 10th. I was driving the wagon and Mr. Bryant was leading some mules. We saw when we got there that Bean and Brown were over in the field and two boys were in there with them. We went up to the gate and it was locked and steepled up. We told them that we came there to plow some, and they said that they come there for the same purpose; said Mr. Turner was there to keep them out but it didn't do any good. Q. Did you see any guns? A. Yes, sir. Q. What kind? A. Shotguns."

Coleman Bryant, a witness for the plaintiff, testified:

"Q. Didn't they tell you why they didn't want you to come in? A. Yes, they said they had rented that place and they were going to cultivate it. I think those were their exact words. Q. Did you see any guns? A. Yes, sir; I saw two. Q. What kind? A. Double-barreled shotguns. Q. You say that was on the 10th? A. On the morning of the 10th. Q. Then you and Mr. Ayers went away? A. Yes, sir; we went back home. Q. Didn't you make any attempt to go inside? A. No, sir. Q. Why didn't you? A. Because we didn't want to break no locks to get in. It was locked up."

The defendant William Bean testified in part as follows:

"Q. Who did you find there on the place? A. Ed Turner. Q. Tell what took place. A. We went down there and the gate was fastened up and we taken it down. Then we went 50 or 75 yards and met Ed Turner and he told us that Mr. Bilby had given orders for us to stay off of that place. We told him that we guessed we'd give him the same orders; that we were going to work that place this year. Then we went on back and struck their plows and set them out and went on down to the other gate and it was locked and we stayed there at that gate and along come these boys to plow again. They come up and we talked a little bit. We told them to stay out. That's about all. Q. Did they stay out? A. Yes, sir. Q. You say you tore the gate down? A. Yes, sir. Q. Which one? A. The north gate. Q. That went into these lands in controversy, this 40? A. Yes, sir. Q. What day was that you tore it down? A. I don't remember. Q. Was it the day that Ed Turner come up and told

you to get off? A. Yes, sir. Q. What did you tear it down for? A. To get in there to plow. Q. Didn't you know that Mr. Bilby was claiming possession of that land? A. I heard he was rowing about it. Q. You were told whose land it was before that, weren't you, that it was Mr. Bilby's? A. No, sir; I think not. Q. Didn't Mr. Gamble go around about a week before that and fix up the gate and fence? A. I don't know what Gamble done. Q. When was the first time you went there to plow? A. Some time about the 1st of February. Q. Wasn't the gate nailed up then? A. No, sir. Q. The next time you went there, was it? A. Yes, sir. Q. Was the other gate also locked? A. Yes, sir. Q. Who locked it? A. I don't know. Q. You never said anything to Mr. Bilby about going in there, did you? A. No, sir."

The defendant William Brown testified in part as follows:

"A. We talked with them a few minutes and then we come up here and told Mr. Gilliland that Bilby's men were down there at work and he told us that he had rented the place to us and for us to go ahead and farm it. Q. You came up and counseled him about it? A. Yes, sir; we come up to see him about it. Mr. Lawson: We object. Q. What time did you go back to the 40? A. About 6 or 7 o'clock in the morning. Q. What took place there then? A. Mr. Turner was there; said Mr. Bilby told him to tell us not to farm there. We found our plows on the outside of the fence, and we forced the gate and carried them back in and put their plows out. Q. And you have been there ever since? A. Yes, sir. Q. You and Bean collected there that morning and went and tore that gate down? A. Yes, it was always open when we went there before. Q. Wasn't it fastened up before that? A. It was after they throwed our plows out. Q. You tore it loose? A. Yes, sir. Q. What did you tear loose? How was the gate fastened? A. It was fastened up with steeples and wire run down around it. Q. How did you get it open? A. Broke it open; kicked it open; any way to get it open. Q. That was on the 10th of February, 1911? A. Yes, sir. Q. That was the morning that Ed Turner was there, the morning that you found Mr. Bilby's cattle and hogs in there and drove them out of the field? A. Yes, sir. Q. And told Ed about it? A. Yes, sir. Q. Then you took Mr. Bilby's plows and threw them out of the field? A. Yes, sir. Q. Off of this 40? A. Yes, sir. Q. You say you let the matter alone until Mr. Bilby had gathered his crop. When did he get it off? A. He got the corn off about the 1st of February. Q. A little while before you went in?

A. Yes, sir. Q. Was that the first time you went in there? A. We plowed in there before that. Q. You plowed in there about the 9th?. A. I think it was about the 8th. Q. That was the first time you went over in there plowing around? A. That was the first time, yes. Q. Did you have permission from Mr. Bilby to go in there? A. No, sir."

It appears clearly from this testimony that the defendants, without the consent of the plaintiff, who was in the peaceable and quiet possession of the premises, entered thereon and held the possession literally *vi et armis*. It is true they did not make any threats or demonstrations with the double-barrel shotguns that they had with them on the morning of the 10th of February, 1911, when the plaintiff's tenants came to the premises to renew their work, but that was not necessary. They had the arms there, and the presence of the arsenal had the desired effect in keeping the plaintiff's agent from entering upon the premises. This court cannot approve the "strong arm method" employed by the defendants in error to gain and hold possession of the premises in controversy. They were tenants of Gilliland. It was the duty of their landlord to place them in peaceable possession. They were not called upon to inject themselves into the controversy between Bilby and Gilliland. They had no legal right to dispossess Bilby, and there was no justification for their holding possession by force. They were wrongdoers from the beginning. Possession thus gained and held cannot be sustained by this court.

The plaintiff, at the close of the evidence, requested the court to give a peremptory instruction to the jury to return a verdict for the plaintiff, and this is one of the assignments urged on the appeal. This instruction should have been given, and a refusal to give it was reversible error, since there was no evidence to sustain a verdict for the defendants.

The only theory upon which the verdict for the defendants can be explained is that the jury considered and tried the question of title to the land as between Bilby and Gilliland and found for the latter. In this action of forcible entry and detainer the right to the possession only and not the title can be tried. Sec-

tions 5503, 5504, Rev. Laws 1910; *Olds v. Conger,* 1 Okla. 232, 32 Pac. 337; *McDonald v. Stiles,* 7 Okla. 327, 54 Pac. 487; *Dysart v. Enslow,* 7 Okla. 386, 54 Pac.. 550; *Brown v. Hartshorn,* 12 Okla. 121, 69 Pac. 1049; *Anderson v. Ferguson,* 12 Okla. 307, 71 Pac. 225; *Jones v. Seawell,* 13 Okla. 711, 76 Pac. 154; *Zahn v. Obert,* 24 Okla. 159, 103 Pac. 702; *Vansellous v. Huene,* 26 Okla. 243, 108 Pac. 1102; *Turner v. Moore,* 34 Okla. 1, 127 Pac. 487; *Maples v. Smythe,* 35 Okla. 469, 130 Pac. 145.

On account of the error above set out, the judgment appealed from should be reversed, with directions to the county court of Hughes county to vacate the judgment and to enter a judgment for the plaintiff in error and against the defendants in error for the possession of the premises, and costs.

By the Court: It is so ordered.